2012 UT 72

Michael K. SUAREZ, John S. Weisheit, Harold Shepherd, Jennifer P. Speers, Tara Collins, William Love, Sarah M. Fields, John C. Dohrenwend, Paul Janos, Steve Mulligan, and Barbara A. Morra, Plaintiffs and Appellants,

v.

GRAND COUNTY, Utah and The Grand County Council, Defendants and Appellees,

Cloudrock Land Company, LLC, Defendant–Intervenor and Appellee.

No. 20110102.

Supreme Court of Utah.

Oct. 23, 2012.

Rehearing Denied Jan. 31, 2013.

J. Craig Smith, R. Christopher Preston, Salt Lake City, for appellants.

Craig J. Carlston, Logan, K. Andrew Fitzgerald, Moab, for appellees Grand County and Grand County Council.

Michael D. Zimmerman, Troy L. Booher, Wade R. Budge, Salt Lake City, for appellee Cloudrock Land Company, LLC.

Chief Justice DURRANT, opinion of the Court:

## INTRODUCTION

¶ 1 This appeal concerns a challenge by a group of citizens (Citizens) to an ordinance passed by the Grand County Council (Council) approving amendments concerning a Planned Unit Development (PUD) district. In the district court, Citizens claimed that the Council had acted administratively in adopting Ordinance 454 and, accordingly, that the matter should be remanded to the Grand County Board of Adjustments (Board) because the County Land Use, Development, and Management Act (CLUDMA) does not allow a person to challenge an administrative decision in a district court until that person has exhausted his administrative remedies.[1] In the alternative, Citizens argued that Ordinance 454 should be set aside because the County acted illegally in adopting the ordinance. The district court granted summary judgment in favor of the Council and the developer, Cloudrock Land Company, LLC (Cloudrock).

¶ 2 We are required to consider (1) whether the Council acted in its legislative or administrative capacity when it adopted Ordinance 454 and (2) whether Ordinance 454 should be set aside based on Citizens' claim that the Council adopted the ordinance ille-

gally. We conclude that the Council acted legislatively when it adopted Ordinance 454 because the ordinance is a new law of general applicability adopted after the Council weighed various policy considerations and because the ordinance has the formal nature of a legislative act. We also conclude that the Council did not act illegally in adopting Ordinance 454 and decline to set it aside.

## BACKGROUND

¶ 3 On February 4, 2002, the Council adopted a resolution (2002 Resolution), approving a PUD rezoning for a nearly two-thousand-acre parcel of land, originally referred to as "Johnson's Up–on–Top Mesa" (Cloudrock Development).[2] This land is owned by Utah's School and Institutional Trust Lands Association (SITLA) and is located southeast of Moab in unincorporated Grand County. The 2002 Resolution also approved a preliminary phase 1 plat for forty-eight lodge units, a preliminary PUD master plan for the entire project, a use-on-review application for a wilderness lodge, and a special-exception application for the lodge accommodation unit size. The 2002 Resolution stated that the preliminary master plan was subject to a development agreement for the project (Original Agreement) between the County and Cloudrock's predecessor, Moab Mesa Land Company, LLC (Moab Mesa).

¶ 4 The Original Agreement provided as follows:

County and developer agree that each shall comply with the standards and procedures contemplated by the Grand County Land Use Code [(LUC)] and the General Plan, each as in effect as of the public hearing with the County Council dated April 2, 2001, with respect to all required development approvals of the uses, densities, and general configuration of the Project.[3]

---

1. UTAH CODE § 17–27a–801(1) ("No person may challenge in district court a county's land use decision made under this chapter, or under a regulation made under authority of this chapter, until that person has exhausted the person's administrative remedies ... if applicable.").

2. Because the parties now refer to it as the Cloudrock Development, we use that name throughout this opinion, except in quotations that refer to the property as Johnson's Up–on–Top Mesa.

3. Accordingly, although the LUC has subsequently been modified, unless otherwise indicated we

And it specified that Moab Mesa would be permitted to modify the development if the overall density of the project remained the same.

¶ 5 After the Council adopted the 2002 Resolution, Citizens appealed the Council's action to the Board, but this challenge was unsuccessful. Nonetheless, from 2002 to 2006, the Cloudrock Development was involved in litigation that stalled work on the development. During this time, Moab Mesa did not file a final plat for any phase of its development.

¶ 6 Cloudrock succeeded to Moab Mesa's interest in the development, and in October 2006, Cloudrock submitted an application to the Planning Commission in order to begin the process of amending approvals granted in the 2002 Resolution (Cloudrock Application).[4] In December, the Planning Commission held a hearing to consider the Cloudrock Application. Notice for the public hearing regarding the application had previously been published twice in the *Times Independent*. This notice provided the date, time, and place of the public hearing and stated that "the Grand County Planning Commission will hold a public hearing to hear public comment on the [Cloudrock] Amended Master Plan and Amended Preliminary Phase 1 Plat, a Planned Unit Development." This notice also specified that Cloudrock was the applicant. Further, it described the property as "located on the Grand County/San Juan County border on the Johnson's up-on-top mesa," and noted that "the proposed subdivision includes approximately 1900 acres of real property and 372.5 equivalent residential units (ERUs)."

¶ 7 In January 2007, the Planning Commission recommended approval of the Cloudrock Application, subject to certain conditions, including that Cloudrock make specified changes to the Original Agreement. After receiving the Planning Commission's recommendation, the Council published notice of a hearing regarding the Cloudrock Application.

As with the notice for the public hearing held by the Planning Commission, this notice was published in the *Times Independent*; provided the date, time, and place of the public hearing; specified that Cloudrock was the applicant; and described the property and its location. Additionally, it stated that "the Grand County Council will hold a public hearing to hear public comment on the [Cloudrock] Amended Master Plan and Amended Preliminary Phase 1 Plat, a Planned Unit Development."

¶ 8 At the hearing, several people, including some Citizens, spoke against the proposed changes. Citizens also submitted written objections to the County Council, both individually and through counsel. Among other things, Citizens argued that approval of the Cloudrock Application would be illegal because approval for Cloudrock's preliminary phase 1 plat had lapsed, and that the preliminary plat was therefore void.

¶ 9 Subsequently, Cloudrock submitted its Amended Agreement, which incorporated the changes suggested by the Planning Commission. The Council then met to consider Cloudrock's Application, including its Amended Agreement and Amended Preliminary Plat. After a motion to approve the Cloudrock Application failed, the Council voted to table the matter until a subsequent meeting.

¶ 10 At a second meeting, the Council voted 4–3 to adopt Ordinance 454, which approves the Amended Agreement, Amended Master Plan, and Amended Preliminary Plat. Specifically, Ordinance 454 explains that Cloudrock had "submitted for county approval a proposed amendment to the [Cloudrock] Preliminary PUD and the Amended and Restated ... Development Agreement ...," which is incorporated herein by reference, including all exhibits thereto." And it states that Cloudrock "and its predecessor have diligently pursued the subject Planned Unit Development and related approvals since their approval and the Grand County Council

will refer to the LUC as last amended February 22, 2000.

4. Although we realize that not all the materials were submitted at the same time, we use the term "Cloudrock Application" to refer collective-

ly to all of the materials and amendments submitted by Cloudrock to the Planning Commission and the County prior to the adoption of Ordinance 454.

finds that such efforts constitute good cause for purpose of extending the preliminary plat approval period." Thus, the ordinance declares that the Council "does hereby approve the ... Preliminary PUD and Master Plan as proposed, and the Amended and Restated ... Development Agreement."

¶ 11 Ordinance 454 also directs Cloudrock to "perfect the record with regard to Use on Review concerning changes to the Wilderness Lodge and Special Exception regarding road design variations and to include all items as exhibits to the ordinance." Additionally, Ordinance 454 outlines changes relative to the original approval of the PUD master plan, including a 67.5 percent reduction in lodging units and a 64 percent increase in mesa residential units. It acknowledges that, although the overall size of the PUD remained the same, the boundaries had changed since the original approval due to "the correction of de minimis survey errors and land trades."

¶ 12 The Amended Agreement, approved by and incorporated in Ordinance 454, states that "[t]he Parties desire to amend and restate in its entirety the Development Agreement regarding the use and development of the Property and to incorporate the modifications to the [PUD] Development Agreement under the approved PUD Amendment." The Amended Agreement contained several exhibits, including a legal description of the property, the Amended Master Plan, the Amended Preliminary Plat, and the Cloudrock Code. The Amended Master Plan and Amended Preliminary Plat involve maps of the Cloudrock Development. The Cloudrock Code states that it "is conceived to administer and guide the building of Cloudrock within ... Grand County, Utah." It "contains specific provisions that define (1) dimensional standards with respect to minimum lot area,

setbacks, lot width and height; (2) road design standards; and (3) architectural standards, but does not otherwise modify the Grand County Land Use Code." It also provides that "[t]here shall be two levels of deviation from the requirements of this code: [w]arrants and [v]ariances." Finally, it defines five types of zones that will be contained in the Cloudrock Development and then provides a Regulating Plan, which is a series of maps assigning the zones within the master plan.

¶ 13 Following the Council's adoption of Ordinance 454, Citizens filed an appeal of the Council's decision with the Board. In September, the Grand County Attorney, stating that she represented the Board and the Council, notified Citizens that the Board lacked jurisdiction to consider the appeal. Citing section 17–27a–801 of CLUDMA,[5] the Grand County Attorney explained that only the district court could review a legislative act such as Ordinance 454, and that the Board "has no authority to overturn an ordinance enacted by the Grand County Council."[6]

¶ 14 Citizens had already filed a challenge to Ordinance 454 with the district court, arguing that the Ordinance should be set aside because it had been adopted illegally, and naming Grand County and the Council as defendants. Soon thereafter, Cloudrock moved to intervene in the lawsuit, and the court granted its request. Subsequently, Citizens amended their complaint to argue that the Council's adoption of Ordinance 454 was administrative, rather than legislative, and that the matter must therefore be remanded to the Board so that Citizens could exhaust their administrative remedies, as required by section 17–27a–801(1) of CLUDMA.

---

5. Utah Code § 17–27a–801(2)(a) ("Any person adversely affected by a final decision made in the exercise of or in violation of the provisions of this chapter may file a petition for review of the decision with the district court within 30 days after the local land use decision is final."); *see also id.* § 17–27a–801(1) ("No person may challenge in district court a county's land use decision made under this chapter ... until that person has exhausted the person's administrative remedies ... *if applicable.*" (emphasis added)).

6. The Board only has the authority "[t]o hear and decide appeals where it is alleged there is error ... by an *administrative* board or official in the enforcement of this Ordinance," or "[t]o permit [v]ariance or modifications of the height of structures, yard, area, and parking regulations." Grand County, Utah, Land Use Code art. VI.A.2.c(1)-(2) (2000) (emphasis added).

¶ 15 The parties filed cross-motions for summary judgment, and the district court granted summary judgment for Cloudrock, the Council, and the County. The court ruled that the Council had acted legislatively in enacting Ordinance 454, that the ordinance furthered the purpose of CLUDMA, and that it was not otherwise illegal. Citizens appealed the district court's decision to this court, challenging the district court's ruling on the merits and questioning whether the district court could have properly considered the issues in the absence of a certified record of the proceedings before the Council.[7] On appeal, Cloudrock argued that Citizens lacked standing to challenge the passage of Ordinance 454.[8] Without addressing the merits of the case, we ruled that Citizens had standing to challenge the ordinance and remanded the case to the district court, ordering the County to transmit the record of the Council's proceedings to the district court.[9]

¶ 16 On remand, the district court again granted summary judgment for Cloudrock, determining once more that the Council had acted in its legislative capacity and that its decision to adopt Ordinance 454 was not illegal. Citizens appealed the district court's decision, arguing that the Council's approval of Ordinance 454 was administrative and the district court therefore lacked jurisdiction to consider the matter, and in the alternative that Ordinance 454 should be set aside because it was adopted illegally.

¶ 17 We have jurisdiction under section 78A–3–102(3)(j) of the Utah Code.

## STANDARD OF REVIEW

¶ 18 "A district court's grant of summary judgment is a legal ruling that we review without deference."[10] Moreover, "[a] district court should grant summary judgment only when, viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[11]

## ANALYSIS

I. BECAUSE ORDINANCE 454 IS A NEW LAW OF GENERAL APPLICABILITY THAT THE COUNCIL ADOPTED AFTER WEIGHING POLICY CONSIDERATIONS, AND BECAUSE IT HAS THE FORMAL NATURE OF A LEGISLATIVE ACT, WE CONCLUDE THAT THE COUNCIL ACTED LEGISLATIVELY IN ADOPTING THE ORDINANCE

¶ 19 Citizens argue that the Council acted administratively, rather than legislatively, in adopting Ordinance 454. In *Carter v. Lehi City*, we provided guidelines for determining whether action by a government is legislative or administrative.[12] In our opinion in *Carter*, we used the term "executive" rather than "administrative," but we explained that "executive power . . . encompasses prosecutorial or administrative acts aimed at applying the law to particular individuals or groups based on individual facts and circumstances."[13] Thus, in many instances, the term "administrative" may be synonymous with the term "executive." With that in mind, two guidelines that we set forth in *Carter* are particularly applicable to the matter before us. The first guideline is that "legislative power gives rise to new law, while executive power implements a law al-

7. *Morra v. Grand Cnty.*, 2010 UT 21, ¶¶ 9–11, 230 P.3d 1022.

8. *Id.* ¶ 14.

9. *Id.* ¶ 39.

10. *Morra v. Grand Cnty.*, 2010 UT 21, ¶ 12, 230 P.3d 1022.

11. *Id.* (second alteration in original) (footnote omitted) (internal quotation marks omitted).

12. 2012 UT 2, ¶ 32, 269 P.3d 141 ("It may not be possible to mark the precise boundaries of [the legislative] power with bright lines. But we can describe the essential hallmarks of such power . . . ." (footnote omitted)). In *Carter*, "we repudiate[d] the 'three-part balancing test' for distinguishing legislative and executive acts articulated in *Citizen's Awareness Now v. Marakis*, 873 P.2d 1117, 1123 (Utah 1994)" and developed in subsequent cases. *Id.* ¶ 60.

13. *Id.* ¶ 34.

ready in existence."[14] To clarify this distinction, we recognized "two key hallmarks of legislative power."[15] One hallmark is that "[l]egislative power generally ... involves the promulgation of laws of general applicability."[16] Another hallmark is that "[l]egislative power generally ... is based on the weighing of broad, competing policy considerations."[17]

¶ 20 Although this first guideline may be sufficient to resolve many cases, we recognized that some "zoning decisions are more difficult to classify, as they involve acts in the gray area between the clearly legislative and the clearly executive."[18] Thus, a second helpful guideline is that when land use decisions "are at least arguably legislative," we "give understandable deference to the formal nature of the government body involved in making them and the formal nature of the zoning ordinance."[19]

¶ 21 Under these two guidelines, we conclude that the County acted in its legislative capacity in adopting Ordinance 454 because (A) it is a new law of general applicability that the Council adopted after weighing policy considerations, and (B) it has the formal nature of a legislative act.

A. *Ordinance 454 Is a New Law of General Applicability that the Council Adopted After the Weighing of Policy Considerations*

¶ 22 We conclude that Ordinance 454 is a new law of general applicability that the Council adopted after the weighing of policy considerations because (1) the ordinance creates new law by replacing the Original Agreement with the Amended Agreement; (2) the Amended Agreement states that it will run with the land, and the Cloudrock

Code provides for administrative deviations, indicating that it is a law of general applicability; and (3) the findings in the ordinance illustrate that the Council considered policy matters.

1. Ordinance 454 Creates New Law, Rather Than Implementing Law Already in Existence, by Replacing the Original Agreement with the Amended Agreement

¶ 23 Citizens contend that, rather than weighing policy considerations and creating new law, Ordinance 454 simply implemented law already in existence. Specifically, they contend that the 2002 Resolution created the PUD and granted the approvals associated with the project; thus, Ordinance 454 merely implemented existing law by allowing minor deviations from the approvals granted in the 2002 Resolution.[20] We disagree.

¶ 24 In this case, the effects of Ordinance 454 are primarily brought about through the Amended Agreement, which is approved by and incorporated in the ordinance. And the Amended Agreement states that "[t]he Parties desire to amend and restate *in its entirety* the [Original] Development Agreement regarding the use and development of the Property and to incorporate the modifications to the [PUD] Development Agreement under the approved PUD Amendment." (Emphasis added.) Indeed, this language was one reason that we granted Citizens standing to challenge Ordinance 454 in *Morra v. Grand County*.[21]

¶ 25 In *Morra*, Cloudrock argued that Citizens lacked standing to challenge Ordinance 454 "because their alleged injuries all stem from the Council's approval of the original development in 2002, rather than the Coun-

---

14. *Id.* ¶ 57 (internal quotation marks omitted).

15. *Id.* ¶ 34.

16. *Id.*

17. *Id.*

18. *Id.* ¶ 72.

19. *Id.* ¶ 75.

20. In a related argument, Citizens contend that Ordinance 454 merely implemented applicable

provisions of the LUC. Although the Council followed the guidelines and procedures of the LUC in adopting Ordinance 454, for the reasons set forth in this section, we conclude that it is a new law of general applicability that the Council adopted after the weighing of policy considerations rather than merely an administrative implementation of the existing law contained in the LUC.

21. *See* 2010 UT 21, ¶¶ 16–19, 230 P.3d 1022.

cil's more recent approval of the amended development through Ordinance 454." [22] Similarly, "Cloudrock assert[ed] that the Citizens' challenge [was] simply a belated and improper attack on the 2002 approval, which had already been upheld in the face of an earlier challenge." [23] Citizens responded by, among other things, claiming that they had standing to challenge Ordinance 454 because "Ordinance 454 has a new and different impact[;] . . . that absent Ordinance 454, Cloudrock's amended development could not go forward. . . . [; and] that [b]y seeking to amend earlier development approvals, Cloudrock once again put these matters at issue, subjecting its application to objection and challenge by those adversely affected." [24]

¶ 26 In determining that Citizens had standing to challenge Ordinance 454, we agreed with Citizens' argument that their alleged injuries arose from the adoption of Ordinance 454 rather than the 2002 Resolution.[25] We reasoned that "Ordinance 454 was not just a collection of individual amendments to the development agreement approved by the Council in 2002." [26] Instead, "it approved the Cloudrock Preliminary Planned Unit Development and Master Plan as proposed, and the Amended and Restated Cloudrock Development Agreement." [27] We further explained that "even though a number of the provisions in the amended development agreement remained unchanged from those approved by the Council in 2002, *it was the entire amended agreement* that was presented to, voted on, and adopted by the Council." [28] Thus, we said that, "[i]n essence, Ordinance 454 *replaced* the original development agreement with the amended development agreement." [29]

¶ 27 Further, we note that, although many provisions of the Amended Agreement mirror the Original Agreement, there are also significant changes made under the Amended Agreement. For instance, provisions of the Amended Agreement have been revised in accordance with the recommendations of the Planning Commission. Moreover, the Amended Master Plan indicates boundary changes resulting from land trades and the correction of survey errors. And the Cloudrock Code [30] creates zones within the Cloudrock Development, provides maps depicting the locations of these zones, and puts forth regulation within these zones.

¶ 28 Thus, the fact that the Amended Agreement replaced the Original Agreement in its entirety, rather than implementing the agreement approved by the 2002 Resolution, is an indication that Ordinance 454 involved the creation of new law.

2. Because the Amended Agreement Provides that It Will Run with the Land, and Because the Cloudrock Code Provides for Administrative Deviations, We Conclude that Ordinance 454 Is a Law of General Applicability

¶ 29 Citizens argue that as a "site-specific land use decision," Ordinance 454 is not a law of general applicability. In other words, because Ordinance 454 governs one parcel of property owned by a single owner, Citizens contend that it cannot be considered a law of general applicability. But because the Amended Agreement states that it runs with the land and the Cloudrock Code provides for application of the ordinance to individuals through administrative deviations, we conclude that Ordinance 454 is a law of general applicability.

¶ 30 "When the government legislates, it establishes rules of general applicability." [31] Accordingly, "[w]hen a legislative

22. *Id.* ¶ 16.

23. *Id.*

24. *Id.* ¶ 17 (fifth alternation in original) (internal quotation marks omitted).

25. *Id.* ¶ 18.

26. *Id.*

27. *Id.* (alterations omitted) (internal quotation marks omitted).

28. *Id.* (emphasis added).

29. *Id.* ¶ 19 (emphasis added).

30. We address Citizens' challenges concerning the Cloudrock Code *infra* ¶ 48.

31. *Carter,* 2012 UT 2, ¶ 36, 269 P.3d 141.

body ... enacts a statute or an ordinance, that law applies to everyone within the geographical area over which that body has jurisdiction or to everyone within a category of persons engaged in a particular activity."[32] "A generally applicable rule, in other words, sets the governing standard for all cases coming within its terms."[33] And "[s]o long as the law is formulated in a way that would encompass all who come within its terms, it is an appropriate legislative act."[34] Thus, an act that "extend[s] to only one or a few individuals... [can] still be legislative where it" both "governs all future cases falling under its provisions" and "is based on general policy concerns rather than individual circumstances."[35]

¶ 31 In describing laws of general applicability in the context of land use ordinances, we have explained that "zoning ordinances typically run with the land and apply equally to the property's present owner and all future owners"; thus, they may "establish generally applicable rules in the same sense as any other rule that applies to all present and future parties that meet its terms."[36] But while "enacting a broad zoning ordinance is a legislative act," the "application of a zoning ordinance to individual property owners, such as by 'variances' and 'conditional use' permits, is an executive act."[37]

¶ 32 In this case, the Amended Agreement states that the "Agreement shall be recorded against the Property ... [and t]he agreements contained herein shall be deemed to run with the land and shall be binding on and shall inure to the benefit of all successors in ownership of the Property." Because the Amended Agreement was approved by and incorporated by Ordinance 454, the ordinance "run[s] with the land and appl[ies] equally to the property's present owner and all future owners."[38]

¶ 33 Further, the Cloudrock Code[39] provides requirements "to administer and guide the building of Cloudrock," and specifically provides for the application of the ordinance to individuals through administrative acts. The Cloudrock Code states that "[t]here shall be two levels of deviation from the requirements of this code: [w]arrants and [v]ariances." It further explains that a "[w]arrant is a ruling that would permit a practice that is not necessarily consistent with a specific provision of this Code, but is justified by its intent" and that "[t]he Town Architect shall have the authority *administratively* to approve or disapprove a request for a [w]arrant." (Emphasis added.) Similarly, the Cloudrock Code states that a "[v]ariance is any ruling on a deviation other than a [w]arrant," and that the LUC shall govern variances. The LUC provides that the Board "shall approve, approve with conditions[,] or disapprove an application for a variance after receiving a recommendation from the Zoning Administrator."[40] This indicates that Ordinance 454 is a law of general applicability from which administrative deviations, in the form of warrants and variances, may be granted.

¶ 34 Accordingly, because the Amended Agreement states that it will run with the land, and the Cloudrock Code allows administrative deviations from the general rules im-

---

32. *Id.* (internal quotation marks omitted).

33. *Id.* (internal quotation marks omitted).

34. *Id.* ¶ 45; *see id.* ¶ 41 (explaining that "[b]y granting the legislature the power only to make laws that apply broadly, our constitutional tradition seeks to prevent unfair applications of the law to specific individuals," and accordingly, "[w]hen the legislative power is properly used by weighing broad policy concerns to create a general rule of conduct [that] applies to more than a few people, the concern of a tyrannical majority singling out one individual is greatly reduced" (third alteration in original) (internal quotation marks omitted)).

35. *Id.* ¶ 52 (internal quotation marks omitted). As discussed *infra* Part I.A.3, we conclude that Ordinance 454 was adopted after the Council weighed various policy concerns.

36. *Id.* ¶ 72.

37. *Id.* ¶ 71.

38. *Id.* ¶ 72.

39. We address Citizens' challenges concerning the Cloudrock Code *infra* ¶ 48.

40. GRAND COUNTY, UTAH, LAND USE CODE art. VI.P.2 (2000). Under certain circumstances, the Council alternatively has the authority to administratively approve a variance. *Id.* art. VI.P.2(a).

posed by the ordinance, we conclude that Ordinance 454 is a law of general applicability.

### 3. The Council Adopted Ordinance 454 After Weighing Broad Policy Considerations

¶ 35 Citizens argue that the Council did not weigh broad policy considerations in adopting Ordinance 454. Specifically, they claim that any policy considerations and public interest factors must have been taken into account when the LUC was created or when the Council adopted the 2002 Resolution. Accordingly, they contend that the Council merely applied existing law to the Cloudrock Application rather than considering policy matters in deciding to establish new law. We disagree.

¶ 36 "When government legislates, it weighs broad policy considerations...."[41] On the other hand, "[e]xecutive acts typically are based not on broad policy grounds, but on individualized, case-specific considerations as to whether the acts of a particular person fall within the general rule adopted by the legislature" or legislative body.[42] In this case, rather than simply making a case-specific application of general rules contained in the LUC and the 2002 Resolution to the Cloudrock Application, the findings in Ordinance 454 indicate that the Council considered broad policy matters in deciding to adopt the ordinance.

¶ 37 Ordinance 454 specifically states that the "Council has considered all evidence and testimony presented with respect to the [Cloudrock A]pplication" before deciding to adopt the ordinance. Indeed, before voting to approve the Cloudrock Application and adopt Ordinance 454, Cloudrock submitted its Application to the Planning Commission for its review and recommendation. And the Planning Commission held a public hearing regarding the application before giving its recommendation to the Commission. Further, the Planning Commission conditioned its recommendation of approval on Cloudrock making certain amendments to the development agreement governing the project.

¶ 38 After receiving the recommendation from the Planning Commission, the Council held a hearing on the Cloudrock Application and received testimony regarding the application, including both oral and written objections from some Citizens. After the public hearing, Cloudrock submitted its Amended Agreement, incorporating the recommendations of the Planning Commission. The Council did not give its approval until after Cloudrock had submitted this Amended Agreement in compliance with the Planning Commission's recommendations. Further, when a motion to approve the Cloudrock Application did not pass at the first Council meeting to consider the matter, the Council tabled the matter until a subsequent meeting "to allow more time to effectively consider all data presented," before it ultimately voted to approve the Cloudrock Application and adopt Ordinance 454. Thus, the Council was presented with extensive evidence and testimony before making its decision.

¶ 39 Beyond this, the findings in Ordinance 454 also state that the ordinance was adopted after the Council had determined, among other things, that (1) "the subject property is suitable for development as proposed based on a consideration of environmental and scenic quality impacts," (2) "the proposed uses are consistent and compatible with the character of existing land uses in the surrounding area," (3) "any adverse effects [of the Development] will be adequately mitigated," and (4) "the application together with the Agreement insure that there will be adequate public facilities and services available to serve the proposed development." These findings illustrate that the Council weighed broad policy matters in deciding to adopt Ordinance 454, rather than merely making a case-specific application of existing law to the Cloudrock Application.

¶ 40 In sum, Ordinance 454 replaces the Original Agreement with the Amended Agreement rather than seeking to implement the Original Agreement approved by the 2002 Resolution. The Amended Agreement and the Cloudrock Code establish that Ordinance 454 runs with the land and provides an

---

41. *Carter*, 2012 UT 2, ¶ 38, 269 P.3d 141.

42. *Id.* ¶ 47.

avenue for administrative deviations from the ordinance. And the findings in Ordinance 454 illustrate that the Council considered policy matters in deciding to adopt the ordinance. Together, these factors indicate that Ordinance 454 is a new law of general applicability that the Council adopted after weighing policy considerations.

### B. Ordinance 454 Has the Formal Nature of a Legislative Act

¶ 41 Although our analysis indicates that Ordinance 454 is a new law of general applicability that the Council adopted after weighing policy considerations, we acknowledge that some "zoning decisions are ... difficult to classify," and that "[s]ite-specific zoning ordinances," such as Ordinance 454, "present the classic hard case."[43] When considering whether such ordinances are legislative or administrative, "[i]n cases of doubt," we "give controlling significance to the form of the underlying governmental decision."[44] Indeed, as discussed, when land use decisions "are at least arguably legislative," we "give understandable deference to the formal nature of the government body involved in making them and the formal nature of the zoning ordinance."[45] And in this case, because Ordinance 454 is at least arguably legislative, we defer to the legislative form of the underlying decision, as evidenced by (1) the County's characterization of its action, (2) the substance of Ordinance 454, and (3) the formal process by which the Council adopted Ordinance 454.

### 1. The Characterization of Its Action Indicates that It Acted Legislatively in Adopting Ordinance 454

¶ 42 The Council's characterization of its action in the Amended Agreement approved by Ordinance 454 and through the letter from the County Attorney denying Citizens' appeal to the Board indicate that the Council acted in its legislative capacity. "[A] site-specific zoning decision is legislative ... if it is made by a [government body] that possesses only legislative authority."[46] But where a government body possesses both legislative and administrative authority, a county's characterization of the capacity in which it acted informs our analysis of whether it acted administratively or legislatively,[47] even though the formal label of a government's action "is not dispositive."[48]

¶ 43 For instance, in *Save Beaver County v. Beaver County*, we concluded that the county could not claim an action was administrative when it "clearly intended to act legislatively."[49] In determining that the county had intended to act legislatively, we explained that the county had referred to its legislative powers both in provisions of the ordinance and in the recitals of the agreement being approved by the ordinance.[50] As another indication that the county had intended to act in its legislative capacity, we noted that the county had denied the citizens' administrative appeal "citing 'lack of jurisdiction' and indicating that the 'proper forum for resolving the dispute appears to be in the District Court.'"[51] We explained that "[b]y closing the door to administrative review, [the county] affirmed that it had acted legis-

43. *Id.* ¶ 72.

44. *Id.* ¶ 75.

45. *Id.*

46. *Id.*

47. See *Save Beaver Cnty. v. Beaver Cnty.*, 2009 UT 8, ¶¶ 18–19, 203 P.3d 937 (noting that a county could not claim that its action was administrative when an ordinance, and the underlying agreement it approved, referred to legislative power, and when the county attorney had stated that the county was acting in its legislative capacity); *Bradley v. Payson City Corp.*, 2003 UT 16, ¶ 22, 70 P.3d 47 (noting that, in another case, we

treated the challenged approval of a PUD as an administrative act because the city had conceded that it was an administrative act in its brief on appeal).

48. *Citizens for Responsible Transp. v. Draper City*, 2008 UT 43, ¶ 12, 190 P.3d 1245; *see also Save Beaver Cnty.*, 2009 UT 8, ¶ 20, 203 P.3d 937 (noting that, when a government characterizes its action, "citizens would certainly have a right to challenge that label").

49. 2009 UT 8, ¶ 18, 203 P.3d 937.

50. *Id.*

51. *Id.* ¶ 19.

latively." [52]

¶ 44 As in *Save Beaver County*, in this case, the Amended Agreement, approved by and incorporated in Ordinance 454, specifically states that "Grand County Council, acting in its *legislative capacity*, has made ... determinations with respect to the Project, including all findings of fact and conclusions of law as are necessary to make each of the[se] ... determinations." [53] (Emphasis added.) Likewise, when Citizens attempted to file an administrative appeal with the Board, the Grand County Attorney, stating that he represented the Board and the Council, notified Citizens that the Board lacked jurisdiction to consider the appeal,[54] and that only the district court could review a legislative act such as Ordinance 454. These statements are both indications that the Council acted legislatively in adopting Ordinance 454.

### 2. Because Ordinance 454 Involves Several Actions that CLUDMA Reserves for Legislative Bodies, the Substance of the Ordinance Indicates that the County Acted Legislatively

¶ 45 Examining the substance of Ordinance 454 also indicates that, because the ordinance involves actions that CLUDMA authorizes legislative bodies to take, it has the formal nature of a legislative act.[55] Among other things, CLUDMA provides that a "legislative body may enact land use ordinances and a zoning map consistent with the purposes set forth in this chapter." [56] And a " '[l]and use ordinance' means a planning, zoning, development, or subdivision ordinance of the county[.]" [57] Additionally, "[t]he legislative body may amend: (a) the number, shape, boundaries, or area of any zoning district; (b) any regulation of or within the zoning district; or (c) any other provision of a land use ordinance." [58] And "[t]he legislative body may divide the territory over which it has jurisdiction into zoning districts of a number, shape, and area that it considers appropriate to carry out the purposes of this chapter." [59]

---

**52.** *Id.*

**53.** Citizens contend that, because such language was also used in the Original Agreement, "any legislative findings made by the County Council occurred in 2001 and that the findings were simply restated by the County Council in the Amended Development Agreement," and accordingly, that this "says nothing about whether the County Council was acting in its administrative or legislative capacity as it approved Ordinance 454." But the findings in the Amended Agreement specifically refer to *"this* Agreement," including "the PUD Amendment." Thus, the statement in the Amended Agreement that the Council acted in its legislative capacity refers to its action regarding the Amended Agreement rather than any action it took in the past regarding the Original Agreement.

**54.** Citizens note that they objected to the Grand County Attorney's stating that he represented both the Board and the Council. But they do not indicate the place in the record that contains their objection; nor do they develop this argument on appeal. Nonetheless, we need not consider whether it is proper for the Grand County Attorney to represent both the Board and the Council in such a matter because the issue is not directly before us. We only note that, as in *Save Beaver County*, the Grand County Attorney's statement that the County acted legislatively is one indication that Ordinance 454 is a legislative act.

**55.** If we find that the Council acted legislatively in adopting Ordinance 454, Citizens nonetheless contend that "several of the decisions encompassed within Ordinance 454 are administrative," and that "those portions should be remanded to properly be considered by the Board." They assert that "[t]he character and substance of" any administrative components of Ordinance 454 "did not change from administrative to legislative simply because the County Council and Cloudrock rolled them all together into one land use approval having the form of an ordinance." But as discussed previously, when evaluating Citizens' standing to bring this lawsuit in *Morra v. Grand County*, we noted that "Ordinance 454 was not just a collection of individual amendments to the development agreement approved by the Council in 2002"; instead, the ordinance as a whole "replaced the original development agreement with the amended development agreement." 2010 UT 21, ¶¶ 18–19, 230 P.3d 1022. Further, Citizens have not provided us with an analysis of why we should conclude that any individual component of the ordinance is administrative rather than legislative under the standards we set forth in *Carter*. Thus, we are unpersuaded by this argument.

**56.** UTAH CODE § 17–27a–501.

**57.** *Id.* § 17–27a–103(28).

**58.** *Id.* § 17–27a–503(1)(a)–(c).

**59.** *Id.* § 17–27a–505(1)(a).

Further, "[w]ithin those zoning districts, the legislative body may regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings and structures, and the use of land."[60]

¶ 46 In this case, Ordinance 454 involved several actions that CLUDMA authorizes legislative bodies to take. First, Ordinance 454 "amend[ed] ... [a] zoning district."[61] Under the LUC, a Planned Unit Development district is one type of zoning district.[62] The LUC specifies that "[e]very PUD District approved under the provisions of this Ordinance shall follow the procedure [for] ... [z]oning map and text amendment[s], and be considered an amendment to the zoning map."[63] And "[a]ll Planned Unit Development Districts approved in accordance with the provisions of this Ordinance shall be referenced on the Official Zoning Map."[64] Ordinance 454 amended the boundaries of the PUD district originally created by the 2002 Resolution by shifting nearly one hundred acres in or out of the project area. The Amended Agreement contained the Amended Master Plan involving a map depicting the modified boundaries of the PUD, as well as a legal description of the boundaries of the property. And Ordinance 454 explicitly approved the "Preliminary PUD and Master Plan as proposed." By approving this PUD as amended by this boundary change, Ordinance 454 amended a zoning district.

¶ 47 We note that, because Cloudrock did not present this change as a rezoning, zoning amendment, or zone boundary change before the Commission and the Council, Citizens contend that this change should only be treated as "a correction of de minimis survey errors." But Ordinance 454 specifically stated that the boundaries of the PUD had changed "as a result of the correction of de minimis survey errors *and* land trades between the property owner (SITLA) and the Bureau of Land Management." (Emphasis added.) Further, Citizens do not dispute that the correction of survey errors and land trades involved shifting nearly one hundred acres into or out of the original PUD boundaries. And although nearly one hundred acres may seem minor in comparison to the nearly two thousand acres within the PUD district, we consider this change significant in determining whether the Council acted legislatively or administratively.[65]

¶ 48 Second, through the Cloudrock Code,[66] Ordinance 454 established zoning classifications for the Cloudrock Development and divided the development into zon-

60. *Id.* § 17–27a–505(1)(b).

61. *Id.* § 17–27a–503(1)(a).

62. Grand County, Utah, Land Use Code art. III.A (2000).

63. *Id.* art. III.R.3.

64. *Id.*

65. Citizens also claim that, because Cloudrock did not argue that Ordinance 454 involved a zone boundary change until at the district court, notice regarding the adoption of Ordinance 454 was inadequate. We address this argument *infra* ¶ 66.

66. Citizens argue that we should not consider the effects of the Cloudrock Code in determining whether Ordinance 454 was legislative or administrative because "[t]his argument was not raised before the County Council nor was it properly raised before the district court." They further claim that, as an alternative ground for affirming the district court, this argument is not apparent from the record. The enactment of the Cloud- rock Code is part of the action that Citizens challenge, and we must consider it in order to fairly evaluate whether the action was legislative or administrative. Indeed, the Council created the Cloudrock Code as part of its adoption of Ordinance 454. The Amended Development Agreement, which was approved by and incorporated in Ordinance 454, refers to the Council's approval of the Cloudrock Code and contains the Cloudrock Code as one of its exhibits. And to the extent that our consideration of the Cloudrock Code could be considered an alternative ground for affirming the district court, because Ordinance 454 approved and incorporated the Cloudrock Code, a person of ordinary intelligence would be on notice that a reviewing court would consider the effects of the Cloudrock Code in determining whether the County acted administratively or legislatively in adopting Ordinance 454. *Francis v. State*, 2010 UT 62, ¶ 10, 248 P.3d 44 (explaining that alternate grounds for affirming the district court are "apparent on the record" if the record contains "sufficient and uncontroverted evidence supporting the ground or theory to place a person of ordinary intelligence on notice that the prevailing party may rely thereon on appeal" (internal quotation marks omitted)).

ing districts.[67] The Cloudrock Code describes a "common zoning system" for the Cloudrock Development consisting of the following: "Natural Zone (T1), Rural Zone (T2), Sub–Urban Zone (T3), General Urban Zone (T4), and Urban Center Zone (T5)." Because these zones are not described in the LUC,[68] by defining these zones, Ordinance 454 established zoning classifications by "creat[ing] ... zoning option[s] that did not previously exist and changing the range of available zoning categories versus fitting pieces into the existing zoning categories." [69] In *Carter*, we confirmed our holding in *Friends of Maple Mountain* that "a site-specific zoning decision is legislative if it involves the adoption of a new zoning classification." [70]

¶ 49 Further, the Cloudrock Code explains that "[t]he Regulating Plan assigns the... zones within the master plan," and this Regulating Plan contains maps depicting the location of these zones within the Cloudrock Development. The Regulating Plan, as part of the Cloudrock Code, was approved by and incorporated in Ordinance 454. Thus, the Regulating Plan contained in the Cloudrock Code divides the Cloudrock Development into zoning districts.[71]

¶ 50 Third, Ordinance 454 established regulation within zoning districts—within the Cloudrock Development PUD as a whole, and within the five zones that the Cloudrock Code created. The Cloudrock Code explains that it modifies the following standards applicable to the project: "(1) the dimensional standards with respect to minimum lot area, setbacks, lot width and height; (2) road design standards; and (3) architectural standards, but does not *otherwise* modify the Grand County Land Use Code." (Emphasis added.) And it explains that the different zoning districts created by the Cloudrock Code "impose the discipline of the distribution of lot sizes, setbacks, building types, frontage types, building heights and building function which allow flexibility with specific parameters." Thus, by its plain language, the Cloudrock Code creates regulation within zoning districts by modifying the Grand County Land Use Code to alter certain standards applicable to the project within the different zones that it establishes.

¶ 51 We note that Citizens contend that the Cloudrock Code was originally presented as, and should therefore be treated as, "protective covenants and restrictions for the Homeowners Association" rather than as a zoning code. But regardless of how it was originally presented, the Cloudrock Code, as approved by and incorporated in Ordinance 454, is not labeled as covenants and restrictions for any homeowners association in the development. Instead, the Cloudrock Code is labeled as a "Code," and by its plain language indicates that it modifies enumerated standards applicable to the project but that "it does not *otherwise* modify the Grand County Land Use Code." (Emphasis added.) Thus, we decline to recharacterize the Cloudrock Code as covenants and restrictions for a homeowners association.[72]

¶ 52 In sum, because Ordinance 454 took the foregoing action with respect to zoning and development, we consider it a "land use

---

67. *See* Utah Code § 17–27a–505(1)(a).

68. *See* Grand County, Utah, Land Use Code art. III.A (2000).

69. *Friends of Maple Mountain, Inc. v. Mapleton City*, 2010 UT 11, ¶ 16, 228 P.3d 1238, *abrogated on other grounds by Carter*, 2012 UT 2, 269 P.3d 141.

70. 2012 UT 2, ¶ 75, 269 P.3d 141.

71. *See* Utah Code § 17–27a–505(1)(a).

72. Citizens further argue that, if the Cloudrock Code is treated as a zoning code, it "was not subjected to the same procedure or scrutiny required of a new zoning code" and that it should have been "reviewed pursuant to the Grand County Land Use Code as it existed in 2007," rather than the 2000 version of the LUC. But Citizens had the opportunity to raise in the district court challenges to the Council's compliance with legal requirements should Ordinance 454 be viewed as legislative action. And they do not demonstrate that they preserved this challenge to Ordinance 454 by raising it in the district court when they raised their other claims of illegality. Although we may review an unpreserved claim for plain error, in this case Citizens have not demonstrated, or even argued, that they were harmed by any potential failure to comply with applicable legal requirements in creating the Cloudrock Code. Thus, we reject this argument.

ordinance" under CLUDMA.[73] And the fact that Ordinance 454 involves several types of action that CLUDMA authorizes legislative bodies to take indicates that the Council acted legislatively in adopting the ordinance.

### 3. The Council Adopted Ordinance 454 Through a Formal Process that Is Consistent with the Process It Uses When It Acts Legislatively, Which Is Another Indication that It Acted Legislatively in Enacting Ordinance 454

¶ 53 Finally, Ordinance 454 was adopted through a formal process more consistent with the process that the LUC prescribes for legislative action than the process it prescribes for administrative action. As background, the LUC provides a simple procedure for an administrative body, or a body acting in its administrative capacity, to apply existing law to particular individuals or specific situations. For instance, a "variance" is a "deviation[ ] or modification[ ] of area regulations." [74] And after receiving a recommendation from the Zoning Administrator, the Board decides whether to approve an application for a variance, or to place conditions on approval.[75] Similarly, "[s]pecial exceptions are deviations from otherwise applicable ... standards." [76] And after receiving a recommendation from the Zoning Administrator, the Planning Commission decides whether to approve an application for a special exception, or to place conditions on approval.[77] In the case of both variances and special exceptions, only one public hearing is required before the applicable body votes on the application, and no further review is required by any other government body.[78] And for both variances and special exceptions, "[a]lternatively and in conjunction with the review of subdivision applications, the County Council shall be authorized to grant"

variances following the same procedure previously specified for each type of administrative deviation.[79]

¶ 54 On the other hand, the LUC provides a more formal and complex procedure for other types of action, such as in the section of the LUC designated "Zoning map and text amendments." [80] The procedure that the LUC prescribes in this section is as follows: After (1) an application for an amendment is submitted to the Zoning Administrator, (2) the Planning Commission must review the application, (3) the Planning Commission must provide adequate notice and hold a public hearing, (4) the Planning Commission must submit its recommendation and report to the Council, (5) the Council must review the application, (6) the Council must provide adequate notice and hold a public hearing, which should include readings of the proposed amendment, and (7) the proposed amendment must receive a favorable vote from a majority of the Council.[81] And we note that the corresponding section of the 2007 Grand County Land Use Code, which prescribes the same process as the 2000 version, states that "[z]oning map and text amendments are discretionary legislative decisions." [82] Thus, this more formal and complex procedure is one indication that the County is acting in its legislative capacity.

¶ 55 In this case, instead of following a simple administrative procedure for reviewing the Cloudrock Application and adopting Ordinance 454, such as the procedure for granting a variance or a special exception, the Council employed a more complex, formal procedure. To begin with, the Planning Commission reviewed the application, held a public hearing, and made a recommendation to the Council. After the Planning Commission provided its recommendation, the Council scheduled a public hearing at which it

---

73. UTAH CODE § 17–27a–103(28).

74. GRAND COUNTY, UTAH, LAND USE CODE art. VI.P.1 (2000).

75. *Id.* art. VI.P.2.

76. *Id.* art. VI.Q.1.

77. *Id.* art. VI.Q.2.

78. *Id.* art. VI.P; *id.* art. VI.Q.

79. *Id.* art. VI.P.2(a); *id.* art. VI.Q.2(a).

80. *Id.* art. VI.B.

81. *Id.*; *accord* GRAND COUNTY, UTAH, LAND USE CODE §§ 7.2.3–7.2.6 (2007).

82. GRAND COUNTY, UTAH, LAND USE CODE § 7.2.1.

heard public comments, including objections to the Cloudrock Application. It also received written objections from some Citizens. After the public hearing, Cloudrock submitted its Amended Agreement, incorporating the recommendations of the Planning Commission. The Council did not give its approval until Cloudrock had submitted this Amended Agreement in compliance with the Planning Commission's recommendations. The Council then held two meetings to consider whether to approve the Cloudrock Application. It tabled the matter after the first meeting, and at a subsequent meeting a majority of the Council voted to approve the Cloudrock Application and adopt Ordinance 454. This formal process is an indication that the Council acted in its legislative capacity.

¶ 56 Together, the County's characterization of its action, the type of action involved in Ordinance 454, and the formal process by which it was adopted indicate the Council acted legislatively in adopting the ordinance. And under the guidelines we set forth in *Carter*, because Ordinance 454 is a new law of general applicability adopted after the weighing of policy considerations, and because it has the formal nature of a legislative act, we conclude that the Council acted legislatively in adopting Ordinance 454.

## II. BECAUSE CITIZENS HAVE NOT DEMONSTRATED THAT ORDINANCE 454 VIOLATES APPLICABLE ZONING ORDINANCES, WE REJECT CITIZENS' CLAIM THAT WE SHOULD SET ASIDE THE ORDINANCE

¶ 57 Citizens contend that the district court erred in holding that they failed to demonstrate that Ordinance 454 should be set aside because the Council's adoption of the ordinance was illegal. As an initial matter, we presume that land use decisions are valid, and we "determine only whether or not the decision, ordinance, or regulation is arbitrary, capricious, or illegal." [83] For us to set aside Ordinance 454 due to illegality, we must first determine that the ordinance does not comply with "the terms and standards of applicable zoning ordinances" already in place.[84] Second, Citizens "must establish that they were prejudiced by the [County's] noncompliance with its ordinances or, in other words, how, if at all, the [County's] decision would have been different and what relief, if any, they are entitled to as a result." [85]

¶ 58 In this case, Citizens put forth three arguments in support of their position that Ordinance 454 was adopted illegally and should be set aside. First, Citizens claim that the Amended Preliminary Plat should not have been approved because the approval period for Cloudrock's preliminary plat had lapsed. Second, Citizens contend that Ordinance 454 was inconsistent with provisions of the Grand County General Plan (General Plan), specifically, the 1997 Public Facilities Analysis (PFA). Finally, Citizens contend that notice for the public hearings regarding Ordinance 454 was inadequate. As to each of these arguments, we conclude that Citizens have not demonstrated that the Council acted illegally by adopting Ordinance 454. Accordingly, we reject Citizens' claim that we should set the Ordinance aside.

---

83. Utah Code § 17–27a–801(3)(a)(ii).

84. *Springville Citizens for a Better Cmty. v. City of Springville*, 1999 UT 25, ¶ 30, 979 P.2d 332. The issue in *Springville Citizens* involved a challenge to the approval of a PUD. We note, however, that we decided *Springville Citizens* before our decision in *Carter*. In *Springville Citizens*, we treated the PUD approval as an administrative act because of "Springville City's assertion that the challenged decision was 'an administrative one.'" *Bradley v. Payson City Corp.*, 2003 UT 16, ¶ 22, 70 P.3d 47 (quoting Brief for Appellee at 19, *Springville Citizens*, 1999 UT 25, 979 P.2d 332).

85. *Springville Citizens*, 1999 UT 25, ¶ 31, 979 P.2d 332. Citizens, without substantial analysis, refer to the prejudice requirement in *Springville Citizens* as "dicta." The Utah Court of Appeals has criticized the prejudice requirement as "impos[ing] a difficult—if not impossible—burden on a citizen who seeks to challenge the procedural legality of a city's land use decision." *Gardner v. Perry City*, 2000 UT App 1, ¶ 20 n. 7, 994 P.2d 811. Because the prejudice prong does not affect the outcome of our decision here, we decline to address its validity.

## A. The Council's Decision to Adopt Ordinance 454 More Than Twelve Months After the Approval of the Original Preliminary Plat Was Not Illegal Because the Council Had Good Cause to Extend the Approval Period

 ¶ 59 Citizens claim that the County adopted Ordinance 454 illegally because the approval period for Cloudrock's original preliminary plat had lapsed by the time the Amended Preliminary Plat was approved through the adoption of Ordinance 454. Specifically, Citizens contend that the County failed to comply with the LUC by either granting a time extension for, or giving final approval to, the original preliminary plat within the twelve-month period following the Council's original grant of approval for the preliminary plat.[86] Accordingly, they contend that Ordinance 454 is illegal because the Council could not have approved the Amended Agreement after the preliminary plat had lapsed. We conclude that the Council did not act illegally on this basis.

¶ 60 The Council's adoption of Ordinance 454 is valid even though it approved amendments to the preliminary plat more than twelve months after the original approval. The LUC states that the "Council may extend the approval period for one (1) or more times for good cause." And Ordinance 454 states that the Council finds that Cloudrock's efforts on the project "constitute good cause for purposes of extending the preliminary plat approval period under Article VI.D.7.b of the [2000] Grand County Land Use Code." Citizens have not pointed to any provision of the LUC that requires the Council to grant an extension of the approval period during the twelve months following the original grant of approval. Further, even if the extension of approval was not valid, the preliminary plat deals with just one parcel of the development. Thus, it is not clear how any lapse of the preliminary plat would affect the project as a whole or any other approvals associated with the development. Accordingly, Ordinance 454 as a whole is valid on this basis.

## B. The Council's Decision to Adopt Ordinance 454 Does Not Violate the Grand County General Plan

 ¶ 61 Citizens also contend that Ordinance 454 is illegal because various provisions of the LUC require the Council to determine that a proposal is in compliance with the General Plan before making a land use decision,[87] and they argue that the Cloudrock Application was inconsistent with the General Plan,[88] including the PFA. Citizens contend that the Council "could not legally approve any amendment to Cloudrock's Development until the Public Facilities Analysis was updated to include a recalculation of the proposed build out of the area and related impact fees." Because this never occurred, Citizens claim that the adoption of Ordinance 454 was illegal. We conclude that Ordinance 454 is not illegal on this basis.

¶ 62 As background, the PFA was a study conducted to help Grand County plan and provide needed public facilities and services to citizens and visitors in developing areas within Grand County. The PFA included "Build-out Projections," which divided the land in and around Moab into five areas and projected future population density in these areas based on existing development patterns in the region. The district court concluded that the PFA was not legally binding on the Council.

¶ 63 We find that Ordinance 454 is not illegal on this basis. Although Citizens claim that "the Cloudrock Application had to be consistent with the General Plan, which incorporates the Public Facilities Analysis,"

---

86. *See* GRAND COUNTY, UTAH, LAND USE CODE art. VI.D.7.b (2000).

87. *See id.* art. III.R.2.b(1); *id.* art. VI.B.5.e; *id.* art. VI.D.6.

88. Citizens also contend that Ordinance 454 was illegal because there is no evidence that the Council considered the Zoning Map Amendment Guidelines of the General Plan (Guidelines) when reviewing the Cloudrock Application. But Citizens do not cite any provision of the General Plan that requires the Council to document its consideration of the Guidelines. Nor do Citizens point to any evidence, other than the lack of documentation, to show that the Council failed to consider these Guidelines. Thus, we are not persuaded that Ordinance 454 should be set aside on this basis.

they do not point to any language from the General Plan that expressly incorporates the PFA. Further, they acknowledge that they "do not claim that the General Plan require[s] compliance with the Public Facilities Analysis." And they do not point to any provision of the LUC, CLUDMA, or other law that requires compliance with the PFA.

¶ 64 Further, Citizens' concerns about the Council's compliance with the PFA are unwarranted. Although the increased density of the development could create a need for additional public facilities, which might create a greater financial burden on the community, the LUC allows the Council to label a development as an "Extraordinary Impact" when density levels or facility impact exceed projections in the PFA, and to require the developer to pay additional fees.[89] This ensures that a sufficient number of public facilities are included in the development plan. Further, in this case, the Amended Agreement specifically provides that "[i]f the County should determine that Extraordinary Costs (as defined in the Code) will be incurred by the county in serving the Project based upon an Extraordinary Impact (as defined in the Code), then... Developer shall pay specific Extraordinary Costs based upon such an Extraordinary Impact." The Agreement explains that "[s]uch Extraordinary Costs shall be calculated to represent the Developer's proportionate share of the cost of facility improvements."

¶ 65 Thus, even if the PFA had not been updated to include "a recalculation of the proposed build out of the area and related impact fees," both the LUC and the Amended Agreement provide an avenue for a development to be labeled an Extraordinary Impact and for Cloudrock to be required to pay Extraordinary Costs associated with the project. Therefore, we conclude that Ordinance 454 is not illegal as a result of any inconsistencies between the Cloudrock Application and the PFA.

### C. The Council Provided Adequate Notice Regarding the Adoption of Ordinance 454

¶ 66 Finally, Citizens contend that the Council failed to give adequate notice of the "nature and scope" of Ordinance 454. We conclude that Citizens have not shown illegality on this basis.

¶ 67 We have defined adequate notice as "[n]otice reasonably calculated to apprise a person of an action, proceeding, or motion ... [and] sufficient to permit an objection or defense."[90] We have said that this is "an important, but relatively low, threshold to satisfy."[91] Indeed, we have held that "due process does not require municipalities to inundate residents with information about every possible detail of a given action or to foretell all potential consequences of that action."[92] Accordingly, we have found that government bodies have given adequate notice when they have complied with statutory requirements.[93]

¶ 68 CLUDMA requires that notice for a public hearing regarding modification of a land use ordinance must provide "the date, time, and place of the first public hearing to consider the adoption or modification of a land use ordinance; and ... notice of each public meeting on the subject."[94] Similarly, the LUC requires that notice regarding any public hearing related to zoning map or text amendments must be published in a Grand County newspaper at least fifteen days prior

89. Grand County, Utah, Land Use Code art. II.B.

90. *Low v. City of Monticello*, 2004 UT 90, ¶ 15, 103 P.3d 130 (first alteration in original) (internal quotation marks omitted).

91. *Id.*

92. *Id.* ¶ 19.

93. *See id.* (holding that "the City's compliance with the notification requirements of the Utah Code, including the publication of Ordinance 79–

11 pursuant to section 10–3–711, satisfied the demands of due process in the present case"); *Dairy Prod. Servs., Inc. v. City of Wellsville*, 2000 UT 81, ¶¶ 50–51, 13 P.3d 581 (holding that notice of a city's decision to not renew a business license was adequate where the city complied with notification procedures that it had adopted by ordinance); *Naples City v. Mecham*, 709 P.2d 359, 360 (Utah 1985) (holding that a city gave adequate notice of its adoption of a traffic ordinance by virtue of its compliance with section 10–3–711 of the Utah Code).

94. Utah Code § 17–27a–205(1)(a)–(b).

to the hearing, and must include the "time and place of such hearing and the nature of the subject to be considered." [95]

¶ 69 Here, although Citizens do not dispute that the notice complied with the other requirements of CLUDMA and the LUC, they argue that the notice did not fulfill the LUC's requirement of informing the public of "the nature of the subject to be considered." [96] The notice stated that the hearing would be about "Amended Master Plan and Amended Preliminary Phase 1 Plat" for "a Planned Unit Development." And Citizens contend that the notice was inadequate because it did not specifically refer to a rezoning, zoning amendment, zone boundary change, a PUD amendment, a zoning ordinance, or a zoning code.

¶ 70 In this case, providing Citizens with notice that there would be a hearing regarding an "Amended Master Plan and Amended Preliminary Phase 1 Plat" for "a Planned Unit Development" that involved a sizeable piece of property was "reasonably calculated to apprise a person of an action ... [and] sufficient to permit an objection" [97] regarding many aspects of Ordinance 454, including amendments to the master plan and the preliminary plat, and boundary changes to the PUD. Both the Amended Master Plan and the Amended Preliminary Plat involved maps; thus, Citizens were on notice that there might be changes to these maps, including boundary changes. Accordingly, Citizens had sufficient information to allow them to attend the hearing and make any objections regarding boundary changes or other changes to the maps involved in the Amended Master Plan and Amended Preliminary Plat for the PUD.

¶ 71 But it is unclear if the notice adequately informed the public of "the nature of the subject to be considered" regarding other aspects of Ordinance 454, including the creation of the Cloudrock Code. Indeed, notice did not specifically indicate that the Cloudrock Code would be creating zoning classifications for the Cloudrock Development, dividing the development into zoning districts, or modifying the Grand County Land Use Code to create regulation governing these districts. But Citizens have not shown that the notice requirements in CLUDMA or the LUC demand such specificity.

¶ 72 As an initial matter, it is not clear from the plain language of either CLUDMA or the LUC how specific the Council must be in its public notices. As discussed above, CLUDMA requires "notice of each public meeting on the *subject*." [98] The LUC requires notice of "the nature of the *subject* to be considered." [99] Although these provisions make clear that notice must include the "subject" of the Council's proposed action, there is no direction as to how detailed the Council must be in stating the subject matter.

¶ 73 We have not had the opportunity to meaningfully consider what constitutes adequate notice in the context of subject-matter notice provisions like the LUC. The Supreme Court of Colorado, however, has applied a "reasonable relation" standard to a subject-matter notice provision similar to the provisions at issue here. In *Town of Marble v. Darien*, the Colorado Supreme Court interpreted an open meetings law that required "full and timely notice to the public." [100] The plaintiffs in *Darien* challenged a town council's decision to reject a proposal to add a permanent monument to a public park.[101] The plaintiffs claimed that the town's notice, which stated it would be considering an "[u]pdate" to the park project, did not adequately notify them that the town would be making a formal decision regarding the monument.[102]

95. GRAND COUNTY, UTAH, LAND USE CODE art. VI. B.4.1(a).

96. *Id.*

97. *Low*, 2004 UT 90, ¶ 15, 103 P.3d 130 (internal quotation marks omitted).

98. UTAH CODE § 17–27a–205(1)(b) (emphasis added).

99. GRAND COUNTY, UTAH, LAND USE CODE art. VI.4.1(a) (emphasis added).

100. 181 P.3d 1148, 1152 (Colo.2008) (en banc) (emphasis omitted) (internal quotation marks omitted).

101. *Id.* at 1149.

¶ 74 The Colorado Supreme Court "declined to impose a precise agenda requirement [on the full notice provision] because it would unduly interfere with the legislative process."[103] Instead, it "adopted a 'flexible' standard that would take into account the interest in providing access to a broad range of meetings at which public business is considered, as well as the public body's need to conduct its business in a reasonable manner."[104] Accordingly, the court found that "notice is sufficient as long as the items actually considered at the meeting are reasonably related to the subject matter indicated by the notice."[105] The court then held that, because "an ordinary member of the community" would understand that the monument could be considered "in relation to" the update on the park project, the subject matter of the town council's notice was reasonably related to what it actually considered.[106]

■ ¶ 75 We find the Colorado Supreme Court's reasoning persuasive and apply its "reasonable relation" standard here. This standard allows us to balance the public's interest in adequate notice and the Council's need to conduct its business in a reasonable and efficient manner. We apply this standard below.

■ ¶ 76 As stated above, the Council provided notice that it would be holding a hearing about "Amended Master Plan and Amended Preliminary Phase 1 Plat" for "a Planned Unit Development." Citizens correctly point out that the Council's notice did not *specifically* refer to a rezoning, a zoning amendment, a zone boundary change, a PUD amendment, a zoning ordinance, or a zoning code. But the notice did adequately inform the public that the Council would be making major decisions concerning the Cloudrock Development. And, as discussed above, we do not require notice of the Council's precise agenda. The Council put the public on notice that it would be considering the Cloud-

rock Development, and the Council's ultimate actions all related to the Cloudrock Development.

¶ 77 Further, if the Council's notice was deficient, we would expect Citizens to identify some disadvantage as a result. But, to the contrary, Citizens acknowledge that "several members of the public, including some of the Citizens spoke out against the Cloudrock Application at the hearing." They further state that "Citizens also individually and through counsel submitted to the County Council written objections to the Cloudrock Application." Thus, the Council's notice was clearly sufficient to make Citizens aware of the proceedings and provide them the opportunity to present objections both in person and in writing. The Council's notice was therefore sufficient, and we decline to set Ordinance 454 aside on this basis.

¶ 78 In sum, Citizens have not demonstrated that Ordinance 454 is illegal due to the Council's decision to pass the Ordinance more than twelve months after their approval of the original preliminary plat, by any inconsistency between the PFA and the Cloudrock Application, or by any deficiencies in the notice regarding the Cloudrock Application and Ordinance 454. Accordingly, we reject Citizens' argument that Ordinance 454 should be set aside because it was adopted illegally.

## CONCLUSION

¶ 79 We conclude that the Council acted in its legislative capacity in adopting Ordinance 454 because the ordinance creates a new law of general applicability passed after the Council weighed policy considerations, and because it has the formal nature of a legislative act. Further, we conclude that Ordinance 454 should not be set aside because of illegality because, for each of Citizens' claims, the Council complied with applicable zoning ordinances. Thus, we affirm the district

102. *Id.* at 1149, 1151.

103. *Id.* at 1152 (internal quotation marks omitted).

104. *Id.* (internal quotation marks omitted).

105. *Id.* at 1153.

106. *Id.*

court's grant of summary judgment in favor of Cloudrock.